[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-11416

_____

ARIEL MARCELO BASTIAS,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A074-344-653

_____

Before NEWSOM and MARCUS, Circuit Judges, and MIDDLEBROOKS, District Judge.*

NEWSOM, Circuit Judge:

Ariel Bastias petitions for review of the Board of Immigration Appeals's judgment that he is removable on the ground that he was convicted of a "crime of child abuse, child neglect, or child abandonment" within the meaning of 8 U.S.C. § 1227(a)(2)(E)(i). The parties agree that the least culpable conduct criminalized by the Florida statute under which Bastias was convicted—culpably negligent child neglect—fits within the BIA's expansive interpretation of § 1227(a)(2)(E)(i). The question, then, is whether the BIA's reading of that provision is permissible inasmuch as it covers Bastias's offense. Because this Court has already decided that § 1227(a)(2)(E)(i) is ambiguous at *Chevron* step one, because we are bound by that decision, and because the BIA's definition is a reasonable interpretation of the statute, we deny the petition.

I

In October 2019, Ariel Bastias, a lawful permanent resident of the United States, pleaded guilty to and was convicted of an offense under Fla. Stat. § 827.03(2), which is titled "Abuse, aggravated abuse, and neglect of a child." That statute delineates four distinct offenses, listed under subsections (2)(a) through (2)(d). Those

_____

* Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of Florida, sitting by designation.

offenses range in seriousness from the first-degree felony of "aggravated child abuse," Fla. Stat. § 827.03(2)(a), to the third-degree felony of "willfully or by culpable negligence neglect[ing] a child without causing great bodily harm, permanent disability, or permanent disfigurement," *id.* § 827.03(2)(d).

It's unclear from the record to which of § 827.03(2)'s several offenses Bastias pleaded guilty: The information charged him with first-degree felony aggravated child abuse. The judgment lists "aggravated child abuse," but it describes that crime as a second-degree felony and cites only § "827.03(2)" generally. The sentencing score sheet describes Bastias's offense as "child neglect," a third-degree felony, and cites—even more unhelpfully—just § "827.03." And the transcript of Bastias's plea colloquy is hopelessly opaque: The judge stated that he "w[ould] adjudicate [Bastias] guilty of [the] charge of aggravated child—nope, of child neglect—child abuse, child neglect, a felony of the third degree so it's a lesser included offense of what [he] was originally charged with." When the clerk asked for the statute number, the judge said, "Oh, I don't know," one of the lawyers suggested "827," and the judge responded, "Whatever."

After Bastias's conviction—for "[w]hatever"—the Department of Homeland Security served him with a notice to appear before an Immigration Judge on the ground that his conviction rendered him removable under 8 U.S.C. § 1227(a)(2)(E)(i). That provision makes deportable any alien who "is convicted of a crime of domestic violence, a crime of stalking, *or a crime of child abuse,*

*child neglect, or child abandonment.*"  8 U.S.C. § 1227(a)(2)(E)(i) (emphasis added).

Before the IJ, Bastias argued that his 2019 conviction was only for the offense of child *neglect*, *see* Fla. Stat. § 827.03(2)(d)—which, he insisted, is not a deportable offense under the INA.  But the IJ found that the Florida judgment and record of conviction demonstrated that Bastias was convicted of *aggravated child abuse*, *see* Fla. Stat. § 827.03(2)(a).  The IJ concluded that Florida aggravated child abuse categorically falls within the BIA's "broad definition of child abuse" and proceeded to deny Bastias's application for a discretionary cancellation of removal.

Bastias appealed to the Board of Immigration Appeals, renewing his contention that he was convicted only of child neglect.  The BIA held that even if Bastias was convicted of child neglect under § 827.03(2)(d), that offense is categorically a "crime of child abuse" for INA purposes.[1]  The Board explained that it "has interpreted the 'term "crime of child abuse" broadly to mean any offense involving an intentional, knowing, reckless, *or criminally negligent* act or omission that constitutes maltreatment of a child or that impairs a child's physical or mental well-being.'"  Admin. R. at 4 (quoting *In re Velazquez-Herrera*, 24 I&N Dec. 503, 512 (BIA 2008)) (emphasis added).  Such a crime, the Board said, doesn't

---

[1] The BIA interprets the INA's phrase "crime of child abuse, child neglect, or child abandonment" to denote a "unitary concept" that, for short, it simply calls a "crime of child abuse."  *In re Soram*, 25 I&N Dec. 378, 381 (BIA 2010).

require "actual harm or injury to a child" if the defendant's mental state was "greater than common law negligence" and there is "proof of a likelihood or reasonable probability that a child will be harmed." *Id.* (citing *In re Soram*, 25 I&N Dec. 378, 381 (BIA 2010), and *In re Rivera-Mendoza*, 28 I&N Dec. 184, 187–89 (BIA 2020) (quotation marks omitted)).    Child neglect under Fla. Stat. § 827.03(2)(d), the BIA concluded, categorically falls within its interpretation because it requires a mental state of "culpable negligence"—a greater mental state than ordinary negligence—and conduct that "could reasonably be expected to result in" serious injury or death. *Id.* at 4–5 (citing, inter alia, *Jones v. State*, 292 So. 3d 519, 522 (Fla. Dist. Ct. App. 2020), and Fla. Stat. § 827.03(1)(e) (defining "neglect of a child")).  So, the Board held that DHS established Bastias's removability by clear and convincing evidence, and it affirmed the IJ's discretionary denial of cancellation of removal.

Bastias petitioned this Court for review.  Before us, he argues that we should follow the Tenth Circuit's decision in *Ibarra v. Holder*, 736 F.3d 903, 906 (10th Cir. 2013), and hold that the BIA's interpretation of 8 U.S.C. § 1227(a)(2)(E)(i) is impermissibly overbroad to the extent that it includes non-injurious criminally negligent conduct.  Citing *Ibarra*, Bastias notes that in 1996, when § 1227(a)(2)(E)(i) was enacted, most states required a "knowing or intentional" mens rea to convict someone of non-injurious child neglect or endangerment; "[o]nly eleven states clearly criminalized non-injurious child endangerment where the culpable mental state was only criminal negligence."  Br. of Pet'r at 25–26 (quoting

*Ibarra*, 736 F.3d at 915). Therefore, Bastias says, the BIA's reading "falls so far outside the interpretive 'gap' left by Congress" that we shouldn't defer to it. *Id.* at 29 (quoting *Ibarra*, 736 F.3d at 918).

The government responds that the BIA's definition is a reasonable interpretation of an ambiguous statute. It contends that this Court has already determined that § 1227(a)(2)(E)(i) is ambiguous at *Chevron* step one and that we must therefore defer to the Board's interpretation at step two so long as it's reasonable and consistent with the statute. *See* Br. of Resp. at 15 (citing *Pierre v. U.S. Att'y Gen.*, 879 F.3d 1241, 1249 (11th Cir. 2018)); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). The government would have us follow the approach taken by the Second, Third, and Fifth Circuits and conclude (1) that under *Chevron*'s step two, the Board's reading of § 1227(a)(2)(E)(i) needn't be the best interpretation of the statute or reflect the approach of most states and (2) that the Board's expansive interpretation is permissible because it's reasonable. Br. of Resp. at 17–19 (citing *Florez v. Holder*, 779 F.3d 207, 211–12 (2d Cir. 2015), *Mondragon-Gonzalez v. U.S. Att'y Gen.*, 884 F.3d 155, 159–60 (3d Cir. 2018), and *Garcia v. Barr*, 969 F.3d 129, 134 (5th Cir. 2020)).

II

"Whether a conviction qualifies as a 'crime of child abuse' . . . under the INA is a question of law for the Court. We review *de novo* such questions of law, subject to the principles of deference articulated in *Chevron*." *Pierre*, 879 F.3d at 1248–49 (citation

omitted).   Under *Chevron*, "if [a] statute is silent or ambiguous with respect to the specific issue" at hand, we defer to an administrative agency's interpretation if it "is based on a permissible construction of the statute."   467 U.S. at 843.   An agency's interpretation is "permissible" under *Chevron* "so long as [it] is reasonable and consistent with the statute."   *Pierre*, 879 F.3d at 1249 (citing *Chevron*, 467 U.S. at 843).   Published, precedential BIA decisions, if reasonable, are entitled to *Chevron* deference.   *See id.*

## A

We begin with what's undisputed:   First, all agree that we should apply the "categorical approach" to determine whether Bastias was convicted of a "crime of child abuse, child neglect, or child abandonment" within the meaning of the INA.   Under that approach, "we consider only the fact of conviction and the statutory definition of the offense, rather than the specific facts underlying the defendant's case," and we focus on "the least culpable conduct necessary to sustain a conviction under the statute" under which Bastias was convicted.   *Pierre*, 879 F.3d at 1250 (quotation marks omitted).

Second, all seem to agree that the "least culpable conduct" covered by Bastias's statute of conviction is culpably negligent child neglect that doesn't cause significant injury, as criminalized in Fla. Stat. § 827.03(2)(d).   While it once contended that Bastias was actually convicted of aggravated child abuse under Fla. Stat. § 827.03(2)(a), the government now seems to assume, for purposes of our review, that Bastias was convicted under subsection (d) and

argues that a conviction under that subsection qualifies as a "crime of child abuse, child neglect, or child abandonment." *See* Br. of Resp. at 22.[2]

Finally, all agree that Fla. Stat. § 827.03(2)(d) categorically constitutes a "crime of child abuse, child neglect, or child abandonment" within the BIA's broad interpretation of that statutory phrase:  Convictions under § 827.03(2)(d), that is, "necessarily involve[] facts equating to the generic federal offense" as the BIA defines it. *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013) (cleaned up); *see* Br. of Pet'r at 10 (arguing only that the BIA's definition is an impermissible interpretation of the INA).  Section 827.03(2)(d) requires a mens rea of culpable negligence, which is encompassed within the BIA's requirement of an "intentional, knowing, reckless,

---

[2] We would reach the same conclusion independently.  We apply the "modified categorical approach" when a statute is divisible—*i.e.*, when it "lists a number of alternative elements that effectively create several different crimes." *Spaho v. U.S. Att'y Gen.*, 837 F.3d 1172, 1177 (11th Cir. 2016) (quotation marks omitted).  Under that approach, we may look "to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Mathis v. United States*, 579 U.S. 500, 505–06 (2016). But here, those documents don't clearly identify the subsection of Fla. Stat. § 827.03(2) under which Bastias was convicted.  Therefore, we apply the categorical approach to § 827.03(2) and assess whether the least culpable conduct under that statute—culpably negligent child neglect, *see* § 827.03(2)(d)—is categorically a "crime of child abuse, child neglect, or child abandonment" as that phrase is used in the INA.

or criminally negligent" mental state.[3]  *See Velazquez-Herrera*, 24 I&N Dec. at 517.  And § 827.03(2)(d)'s actus reus, "neglect[]," is defined as a caregiver's failure to provide "care, supervision, and services necessary to maintain the child's physical and mental health" or to "make a reasonable effort to protect a child from abuse, neglect, or exploitation by another person."  Fla. Stat. § 827.03(1)(e).

Accordingly, the offense of which all now agree Bastias was convicted fits within the BIA's interpretation of § 1227(a)()(E)(i)'s key statutory phrase, "crime of child abuse, child neglect, or child abandonment," which the Board reads to encompass "child endangerment-type offense[s]" that require a "likelihood or reasonable probability that a child will be harmed."  *Rivera-Mendoza*, 28 I&N Dec. at 186–87 (quotation omitted).

**B**

Because Fla. Stat. § 827.03(2)(d) is a "crime of child abuse, child neglect, or child abandonment" as the BIA interprets that statutory phrase, we must determine whether the BIA's interpretation is permissible insofar as it reaches "culpably negligent" child neglect.  Given our binding precedent, we conclude that it is.

**i**

---

[3] While the parties dispute whether Florida's "culpable negligence" mens rea is equivalent to criminal negligence or something more serious, *see infra* note 5, they agree that it's at least as severe as criminal negligence.  *See* Br. of Resp. at 22–27; Reply Br. of Pet'r at 2–14.  It thus falls within the BIA's definition.

"*Chevron* established a familiar two-step procedure for evaluating whether an agency's interpretation of a statute is lawful. At the first step, we ask whether the statute's plain terms directly address the precise question at issue." *Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (cleaned up); *see Chevron*, 467 U.S. at 842–43. If, "employing traditional tools of statutory construction," we conclude that the statute unambiguously addresses that question, our analysis ends there. *Chevron*, 467 U.S. at 843 n.9. But "[i]f the statute is ambiguous on the point, we defer at step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make." *Brand X*, 545 U.S. at 986 (quotation marks omitted).

However we might decide the issue ourselves—and we can see good arguments going both ways—we are bound by circuit precedent to conclude at *Chevron* step one that 8 U.S.C. § 1227(a)(2)(E)(i) is ambiguous, so we must proceed to step two and defer to the BIA's interpretation so long as it's reasonable. In *Pierre*, we considered whether a conviction for child battery under Fla. Stat. § 784.085 was a "crime of child abuse" under the same provision of the INA at issue here, 8 U.S.C. § 1227(a)(2)(E)(i). *See* 879 F.3d at 1249. We first explained that "[i]f an INA term or provision is undefined or ambiguous, and the BIA has interpreted that term or provision in a published, precedential decision, we defer to the BIA's interpretation under *Chevron*, as long as it reflects a permissible construction of the INA statute." *Id.* Then, observing that "[t]he INA does not define 'child abuse,'" we immediately—and

without further explanation—concluded that the "statute is silent on the issue" and, accordingly, that we should "defer to the BIA's interpretation of the INA, so long as that interpretation is reasonable and consistent with the statute." *Id.*[4] "[A]pplying *Chevron* deference to the definitions of 'child abuse' found in *Velazquez-Herrera* and *Soram*"—the same BIA decisions at issue here—we "uph[e]ld them as reasonable interpretations of the INA, to the extent they appl[ied]" to the case before us. *Id.* at 1251. But because that case involved "a knowing and overt act," we noted that it didn't require us "to determine whether purely negligent acts with no injury to the child proscribed by a state statute constitute generic crimes of child abuse." *Id.* at 1251 n.3.

We are bound by *Pierre* to conclude that the phrase "crime of child abuse, child neglect, or child abandonment" in 8 U.S.C. § 1227(a)(2)(E)(i) is "ambiguous" at *Chevron* step one: *Pierre* proceeded to *Chevron* step two with respect to the very same statutory provision and BIA interpretations that we're now considering. *Id.* at 1249; *see also United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (explaining that under this Court's prior-panel-precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en*

---

[4] The statute doesn't define "crime of child abuse, child neglect, or child abandonment," but *does* define "crime of domestic violence" in the same subsection. *See* 8 U.S.C. § 1227(a)(2)(E)(i); *Florez*, 779 F.3d at 211.

banc"). Therefore, we too must proceed to *Chevron* step two and determine whether the BIA's interpretation is reasonable as applied to Fla. Stat. § 827.03(2)(d).

### ii

The BIA's interpretation of the INA's phrase "crime of child abuse, child neglect, or child abandonment" to include culpably negligent conduct likely to result in harm is a reasonable interpretation of the statute that is entitled to *Chevron* deference.

An agency's interpretation of a statute is permissible—deserving of deference at *Chevron* step two—if it's "reasonable and consistent with the statute." *Pierre*, 879 F.3d at 1249. *Chevron* requires us "to accept the agency's construction of the statute, even if the agency's reading differs from what [we] believe[] is the best statutory interpretation." *Brand X*, 545 U.S. at 980. For better or worse, *Chevron* enables the agency, when faced with statutory ambiguity, to make a "reasonable policy choice" even when that choice leads it to adopt a merely permissible—rather than the best—interpretation of the statute. *Id.* at 986 (quoting *Chevron*, 467 U.S. at 845).

The crux of the parties' dispute is whether the BIA's interpretation of the phrase "crime of child abuse, child neglect, or child abandonment" is reasonable inasmuch as it reaches a crime—Fla. Stat. § 827.03(2)(d)—that requires a mens rea of only "culpable negligence." Florida's "culpable negligence" standard isn't one of the mental states traditionally required for criminal liability—*i.e.*,

intent, knowledge, recklessness, or negligence, *see Borden v. United States*, 141 S. Ct. 1817, 1823–24 (2021)—and the parties disagree about where it falls in the mens rea hierarchy.[5]  But we needn't resolve their dispute because even if we assume that culpable negligence is equivalent to traditional criminal negligence and assess the BIA interpretation at its broadest scope,[6] that interpretation is reasonable.

---

[5] For its part, the government argues that "culpable negligence" under Florida law is "something more" than typical criminal negligence:  Culpable negligence, it says, is "a higher *mens rea* than recklessness."  Br. of Resp. at 22–27 (citing *State v. Greene*, 348 So. 2d 3, 4 (Fla. 1977)), for the proposition that culpable negligence "evinc[es] reckless disregard of human life or of the safety of persons exposed to its dangerous effects . . . or such wantonness or recklessness or grossly careless disregard of the safety and welfare of the public . . . which is equivalent to an intentional violation").  Bastias, by contrast, contends that "culpable negligence" is equivalent to traditional criminal negligence.  *See* Br. of Pet'r at 33–36; Reply Br. of Pet'r at 9–10.  Unlike recklessness, which requires that a defendant subjectively comprehend and "consciously disregard[]" an unreasonable risk, criminal negligence is typically considered a lesser mens rea that is satisfied when the defendant "is not conscious of the unreasonable risk but should be."  *Ibarra*, 736 F.3d at 915 n.16 (citing 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.4 (2d ed. 2003)).

[6] Assuming that culpable negligence is equivalent to criminal negligence requires us to assess the reasonableness of the BIA interpretation insofar as it extends to criminally negligent conduct, rather than just to reckless, knowing, or purposeful conduct.  And at least some Florida child-neglect cases point to "culpable negligence" as encompassing traditional criminal negligence.  For example, in *Lanier v. State*, a Florida appellate court defined "culpable negligence" as "consciously doing an act or following a course of conduct that the defendant must have known, *or reasonably should have known*, was likely to

We'll begin by addressing Bastias's contention that the BIA's interpretation is impermissible because it encompasses conduct that most states didn't criminalize in 1996, when 8 U.S.C. § 1228(a)(2)(E)(i) was enacted. In *Ibarra*, the Tenth Circuit "examined the criminal laws of all fifty states and the District of Columbia in effect in 1996 to determine the majority approach to crimes of child abuse, abandonment, neglect, and endangerment." 736 F.3d at 915. It found that of the 49 jurisdictions that criminalized child endangerment or neglect without resulting injury, 27 states required a mens rea of "knowing or intentional," 6 required recklessness, 11 "clearly criminalized non-injurious child endangerment where the culpable mental state was only criminal negligence," and 5 had an unclear minimum mens rea.[7] *Id.* Bastias argues that we should follow the *Ibarra* court and hold that because at least 33 states didn't criminalize child endangerment offenses where the mens rea was only criminal negligence, the BIA's interpretation isn't permissible. We disagree.

Rather, as the Second and Fifth Circuits have recognized, at *Chevron* step two, "we are not looking for the best interpretation, or the majority interpretation—only a reasonable one." *Florez*,

---

cause death or great bodily harm." 264 So. 3d 402, 406 (Fla. Dist. Ct. App. 2019) (emphasis added) (quotation omitted).

[7] By the *Ibarra* court's count, 8 states required a minimum mens rea of criminal negligence, 2 required only tort negligence, and 1 imposed strict liability—making for a total of 11 states in which criminally negligent child endangerment or neglect was criminalized. *See* 736 F.3d at 920.

779 F.3d at 212; *accord Garcia*, 969 F.3d at 134. While the Supreme Court has identified the generic federal definition of various crimes by examining the approach taken by a majority of the states, *see, e.g.*, *Taylor v. United States*, 495 U.S. 575, 598 (1990); *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1571 (2017), it "has never suggested that an *administrative agency* must employ that method to construe an ambiguous federal term that references state crimes," *Florez*, 779 F.3d at 213. "The agency is required to adopt a reasonable interpretation—not to proceed by any particular interpretative method." *Id.*

In fact, it would likely contravene *Chevron* and its progeny to hold that when states have varying formulations of a crime, the only permissible interpretation open to an agency at *Chevron* step two is that adopted by the majority of jurisdictions. The whole point of *Chevron* and *Brand X*—again, for better or worse—is to allow agencies to make "reasonable policy choice[s]" among competing permissible interpretations of a statute, including policy-based choices to adopt less-than-best readings. *See Brand X*, 545 U.S. at 980, 986; *Chevron*, 467 U.S. at 865–66. Given that we have already held that 8 U.S.C. § 1227(a)(2)(E)(i) is ambiguous and that we must therefore proceed to *Chevron* step two, *see Pierre*, 879 F.3d at 1249, there must be some range of discretion for the BIA to make a policy choice among different possible interpretations. If we were to hold that the Board had to adopt the approach taken by most states, we would eliminate the range of reasonable policy choices that the agency could consider at *Chevron* step two: The

BIA instead would be compelled to adopt the majority interpreta-tion—here, the knowing or intentional mens rea required by 27 states in 1996—rather than just a "reasonable" one. *But cf. Brand X*, 545 U.S. at 980 (requiring a reviewing court to accept an agency's reasonable interpretation of a statute "even if the agency's reading differs from what [we] believe[] is the best statutory interpreta-tion"). So, the fact that most states didn't criminalize criminally negligent child neglect in 1996 doesn't make the BIA's interpreta-tion unreasonable.

We conclude, to the contrary, that the BIA's interpretation of § 1227(a)(2)(E)(i) is reasonable—for two main reasons.

First, the ordinary meaning of the statutory text. The INA—which explicitly includes "crime . . . of child *neglect*"—can reason-ably be understood to include the criminally negligent failure to provide a child with necessary care, as criminalized by Fla. Stat. § 827.03(2)(d). In 1996, *Merriam-Webster's Dictionary of Law* de-fined "neglect," in relevant part, to mean "a failure to provide a child under one's care with proper food, clothing, shelter, supervi-sion, medical care, or emotional stability." Merriam-Webster's Dictionary of Law 324 (1996). That definition is consistent with criminally negligent conduct; it doesn't require intent or the sub-jective awareness of risk. Similarly, *Black's Law Dictionary* defined "neglected child" as one whose "parent or custodian, by reason of cruelty, mental incapacity, immorality or depravity, is unfit properly to care for him, or neglects or refuses to provide necessary . . . care for   him." Black's Law Dictionary 1032 (6th ed. 1990). A

criminally negligent parent—whose gross carelessness causes him not to appreciate an unreasonable risk to his child—is one whose "mental incapacity" or "immorality" makes him "unfit properly to care for" his child. These definitions reflect our linguistic intuitions and conventions: One *neglects* her child when she is criminally *negligent. Compare Neglect*, Oxford English Dictionary (3d ed. 2003), *with Negligent, id.* (both derived from the same Latin root, *neglegere*—"to disregard, overlook, to fail to care for").

Second, contemporaneous statutes. The fact that the BIA's interpretation is consistent with the approach taken by a sizable minority of states and by other federal statutes suggests that it's reasonable. As the *Ibarra* court found, there wasn't a single prevailing definition of "child abuse" or "child neglect" in 1996: While a bare majority of 27 states required a mens rea of knowledge or intent, 6 required recklessness, 8 required criminal negligence, 2 required tort negligence, and 1 imposed strict liability. The Board recognized a "growing acceptance by 1996 that the concept of 'child abuse' included . . . criminally negligent acts." *Velazquez-Herrera*, 24 I&N Dec. at 511. It was thus a "reasonable policy choice," *Brand X*, 545 U.S. at 986, for the BIA, when confronted with an undefined statutory term, to adopt a definition consistent with a sizable and growing minority of states—a definition that mirrored the approach taken by Arizona, Colorado, Florida, Missouri, New Mexico, Oregon, Texas, and Wyoming and was less aggressive than the approach taken by New York, South Carolina, and Nebraska, *see Ibarra*, 736 F.3d at 920; *Florez*, 779 F.3d at 212.

Moreover, some federal statutes defined "child abuse" in a manner that would seem to encompass criminally negligent conduct. *See Velazquez-Herrera*, 24 I&N Dec. at 510–11 (citing, inter alia, 42 U.S.C. § 5106g(4) (1994), and 42 U.S.C. § 5119c(3) (1994)). For example, 42 U.S.C. § 5119c(3) defined "child abuse crime"—for purposes of the federal law requiring states to report such crimes to the national criminal history background-check system—as "a crime committed under any law of a State that involves the physical or mental injury, sexual abuse or exploitation, *negligent treatment*, or maltreatment of a child by any person." 42 U.S.C. § 5119c(3) (1994) (emphasis added). The fact that some federal statutes in 1996 defined "child abuse" to include "negligent" treatment—which, again, would seem to encompass crimes with a mens rea of criminal negligence—further supports the reasonableness of the BIA's interpretation.

\* \* \*

At the end of the day, we are compelled by *Pierre*—and, by extension, *Chevron*—to assess only whether the BIA's interpretation of 8 U.S.C. § 1227(a)(2)(E)(i) is reasonable, not whether it's the best reading of the statute. Because it's reasonable to interpret "crime of . . . child neglect" as including the Florida offense of culpably negligent child neglect, we defer to the BIA's conclusion that Bastias's conviction under Fla. Stat. § 827.03(2) renders him removable.

**PETITION DENIED.**

NEWSOM, Circuit Judge, concurring:

I concur in the Court's opinion today, but write separately to explain my view that this Court's approach to *Chevron* step one in *Pierre v. U.S. Att'y Gen.*, 879 F.3d 1241 (11th Cir. 2018), can't easily be reconciled with Supreme Court precedent that both pre-dates and post-dates our decision there—or, just as importantly, with the separation-of-powers principles that the Supreme Court's recent reinvigoration of step one embodies. In short, we gave up on step one entirely too quickly in *Pierre*. We proceeded directly from the premise that a key statutory term was "not define[d]" to the conclusion that the provision was "silent," and thus ambiguous, and, therefore, that we should move on to the deference that step two typically entails. That was error; *Chevron* step one demands more.[1]

---

[1] Although I find *Pierre*'s methodology to be in significant tension with Supreme Court precedent, I believe that we are nonetheless bound by it under our prior-panel-precedent rule. "Under that rule, a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*," and intervening Supreme Court or en banc precedent can overrule a prior panel decision only if it is "clearly on point." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (quotation omitted). As I've said before, we should resist the urge to invoke "flabbier variants" of the prior-panel-precedent rule "to 'write around'" earlier decisions with which we disagree because "a healthy respect for the decisions of [our] colleagues—both past and present—counsels a fairly rigorous application" of the rule. *Kondrat'yev v. City*

Here's the sum total of the analysis that the *Pierre* Court conducted to determine whether 8 U.S.C. § 1227(a)(2)(E)(i) had a clear meaning at *Chevron* step one: "The INA does not define 'child abuse.' Because the statute is silent on the issue, we may defer to the BIA's interpretation of the INA, so long as that interpretation is reasonable and consistent with the statute." *Pierre*, 879 F.3d at 1249 (citations omitted). That's it. No assessment of ordinary meaning, no consideration of the canons, no analysis of statutory structure—no nothing. Instead, we simply concluded that because the INA didn't expressly "define" the key term, the statute was "silent on the issue" and that we should proceed straight to *Chevron* step two, deferring to the agency's interpretation so long as it was reasonable. Supreme Court precedent makes clear that our duty as judges to say what the law is before declaring a statute ambiguous and ceding the interpretive function to an administrative agency is not so easily sidestepped.

Start with *Chevron* itself. In describing the first step of the analysis that it fashioned—*i.e.*, determining "whether Congress has directly spoken to the precise question at issue"—the Supreme Court said there that "if a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be

---

*of Pensacola*, 949 F.3d 1319, 1334 n.1 (11th Cir. 2020) (Newsom, J., concurring). In my view, no intervening Supreme Court decision is sufficiently "clearly on point" to enable us to ignore *Pierre*.

given effect." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843 n.9 (1984). Thus, the Court directed judges to use all "traditional tools" of statutory interpretation in a genuine attempt to discern a provision's meaning before declaring it "silent or ambiguous" and deferring to any reasonable agency interpretation. *Id.* at 843. *Pierre*'s approach—declaring a statute silent or ambiguous simply because it doesn't explicitly "define" the relevant term—seems hard to square with *Chevron* itself.

More recently, the Supreme Court has taken pains to clarify that *Chevron* step one has teeth: We judges must actually do the hard work of statutory interpretation; we can't just skip ahead to step two. *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562 (2017), decided only eight months before *Pierre*, is a prime example. In that case, the Supreme Court considered whether a California offense criminalizing sex with someone under the age of 18 categorically qualified as "sexual abuse of a minor" as that term is used in the INA. *Id.* at 1567. As in our case, the phrase "sexual abuse of a minor" was added to the INA in 1996 as a crime that renders an alien removable. *Id.* at 1569. And as in our case, the BIA had interpreted that phrase broadly—there, to include statutory rape offenses involving 16- and 17-year-olds. *Id.* at 1567. But quite *unlike* our approach in *Pierre*, the Supreme Court determined *for itself* the meaning of "sexual abuse of a minor." The Court consulted legal dictionaries to determine that the "generic" age of consent in 1996 was 16, examined related federal statutes that specified 16 as the age of consent, and surveyed the states to conclude that in 1996,

32 jurisdictions set the age of consent at 16. *Id.* at 1569–72. Based on that thorough textual, contextual, and historical inquiry, the Court concluded that the phrase "sexual abuse of a minor" embodied an age of consent of 16 and, therefore, that California's offense criminalizing sex with minors under 18 didn't categorically qualify. *Id.* at 1572. Only then, having engaged in a rigorous, de novo statutory interpretation, did the Court conclude, in a single sentence, that *Chevron* didn't "appl[y]" because, it said, "the statute, read in context, unambiguously forecloses the Board's interpretation." *Id.* The difference between the robust interpretive analysis conducted by the *Esquivel-Quintana* Court and the perfunctory approach in *Pierre*—blink and you miss it—is night and day.

Shortly after we decided *Pierre*, the Supreme Court again reiterated the principle "that deference is not due unless a 'court, employing traditional tools of statutory construction,' is left with an unresolved ambiguity." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018). In *Epic Systems*, the Court considered whether to apply *Chevron* deference to an agency opinion suggesting that the National Labor Relations Act displaces the Federal Arbitration Act. *Id.* at 1629. The Court refused on the ground that the canon against reading conflicts into statutes—a "traditional tool of statutory construction"—was "more than up to the job of solving [the] interpretive puzzle." *Id.* at 1630. Because traditional interpretive tools "suppl[ied] an answer," the Court reasoned, "*Chevron* le[ft] the stage." *Id.* (quotation marks omitted).

Even this brief tour shows that we were far too quick in *Pierre* to conclude that 8 U.S.C. § 1227(a)(2)(E)(i) is ambiguous and to defer to any reasonable BIA interpretation. Instead, like the Supreme Court in *Esquivel-Quintana*, we first should have examined the ordinary meaning of the statutory text and contemporaneous state and federal statutes to determine whether the phrase "crime of child abuse" unambiguously encompassed the state offense. And were we not bound by *Pierre* here, our approach in this case should have been to decide for ourselves at *Chevron* step one whether the phrase "crime . . . of child neglect" in the INA unambiguously includes Florida's offense of culpably negligent child neglect. To be sure, we might still have concluded that the statute is ambiguous: The evidence gleaned from contemporaneous dictionary definitions and federal statutes seems to point in the opposite direction from that gleaned from a state-counting approach. *Compare* Maj. Op. at 14, *with* Maj. Op. at 16–18. But that's not the point. The point is that we, as judges in whom the Constitution "vest[s] exclusively" the judicial power of the United States, should *do* statutory interpretation before deferring to any reasonable interpretation offered by an executive agency. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2437 (2019) (Gorsuch, J., concurring in the judgment). If we fail in that obligation—if we shirk our "duty of interpreting the laws" at *Chevron* step one—we exacerbate the risk of the "judicial power be[ing] shared with the Executive Branch" in violation of Article III. *Id.* (quotation marks omitted and alterations adopted).